IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 11, 2009 Session

BOB FANNON, individually and as a City Councilman for the City of
LaFollette v. CITY OF LaFOLLETTE, ET AL.

Appeal from the Circuit Court for Campbell County
No. 13947     John D. McAfee, Judge

No. E2008-01616-COA-R3-CV  - FILED JANUARY 11, 2010

In this action for declaratory judgment against the City of LaFollette, the City Council, and three City Councilmen, the trial court awarded the plaintiff attorney's fees, costs and discretionary costs. On appeal, the defendants argue that the trial court erred in finding the plaintiff as the "prevailing party" in the litigation and that the trial court's award was unwarranted and erroneous. We hold that the plaintiff was not a prevailing party, and therefore, the trial court erred in awarding the plaintiff attorney's fees and costs on that basis.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and D. MICHAEL SWINEY, JJ., joined.

Jon G. Roach and Emily A. Cleveland, Knoxville, Tennessee, for Appellants, City of LaFollette, Hansford Hatmaker, Mike Stanfield, and Ken Snodderly.

David H. Dunaway, LaFollette, Tennessee, for Appellee, Bob Fannon.

**OPINION**

I.  BACKGROUND

This declaratory judgment action was brought by the plaintiff, Bob Fannon, a Councilman for the City of LaFollette ("City"), asserting a violation of the Tennessee Open Meetings Act, Tenn. Code Ann. § 8-44-103 (2002 ). The relevant facts involved in this lawsuit occurred in June of 2007.

According to the complaint, Councilmen Hansford Hatmaker and Mike Stanfield met with various employees in a City administrative office, at which time, raises were planned for certain employees of the City and discussions were held on filling the positions of City Clerk and City Treasurer. Brad Myers, the Data Processing Manager for the City, testified at a later hearing that Mr. Hatmaker was "asking questions" and Mr. Stanfield "maybe made one or two statements." The meeting, according to the witness, was not a regularly scheduled or "called meeting," but was more of a private affair. On the issue of whether the get-together was a meeting in the "Open Meeting" sense, Mr. Myers acknowledged that the general public had not been invited to attend the meeting. He opined that he was invited to the meeting so that the officials in attendance could negotiate his salary. He testified as follows:

A. The only question that was really addressed to me, if I was willing to take a certain salary and that was it.

A. Okay.

THE COURT: What salary?

THE WITNESS: They had -- I was offered -- they asked me if I would stay for $25,000 and I refused to do that.

THE COURT: So they were negotiating with you?

THE WITNESS: Yes.

THE COURT: So who offered you a $25,000 salary?

THE WITNESS: That was Mr. Hatmaker.

City Administrator David Young testified that while it was his responsibility as the City Administrator to recommend salary increases, prior to the "private" meeting at issue, these potential raises were not discussed with him. Mr. Young indicated that he was in Canada when the meeting in question was held; he returned the day before the regularly scheduled meeting of the City Council.

At the regularly scheduled city council meeting on June 28, 2007, Councilman Ken Snodderly moved to amend the reading of the budget to add those changes that purportedly had been fashioned at the earlier "meeting." Mr. Stanfield seconded the motion and he, Mr. Snodderly, and Mr. Hatmaker voted affirmatively for the motion's passage. The salary increases that were discussed and allegedly approved at the informal meeting were then passed by the full City Council at its next regularly scheduled meeting the following month.

This lawsuit was instituted after Mr. Fannon concluded that the Defendants had improperly framed and approved the budget amendments in order to provide raises for City employees in a

-2-

manner that purportedly failed to comply with the City Charter and the Tennessee Open Meetings Act. In his complaint, Mr. Fannon asserted as follows:

> 3. That this is a proceeding for a declaratory judgment and the enforcement of Tennessee's Open Meeting Law and to otherwise have declared illegal and void various actions which were taken by the Defendants and the City Council for the City of LaFollette at a meeting held on June 28, 2007, at which time certain pay raises were granted by the Defendants and the City Council . . . to various employees . . . .
>
> 4. . . . [P]rior to June 28, 2007, and at a time when the City Administrator was away from the City . . . on business matters in Canada, the Defendants, Hansford Hatmaker and Mike Stanfield, met with various employees at . . . [a City] . . . meeting room, at which time raises were planned for certain employees of the City . . . and discussions were held for the filling of the positions of City Clerk and City Treasurer. That at the end of the meeting, a decision was made that a motion would be introduced at the next City Council meeting . . . to include pay raises, as well as the filling of positions by the City . . . . This motion was made by the Defendant, Ken Snodderly.
>
> 5. . . . [T]he discussions concerning pay raises and the filling of positions with the City . . . were of such pervasive importance that proper notice concerning these discussions should have been given to the general public, as well as to the Mayor, the entire City Council, and the City Administrator . . . in accordance with Tennessee's Public Meetings Act.
>
> 6. . . . [T]he meeting held during the week of the City Administrator's absence in Canada and between City Councilman Hansford Hatmaker, and Mike Stanfield, and various employees of the City . . . , and the planning of the introduction of a motion by the Defendant, Ken Snodderly, to grant raises and fill positions for the City . . . was in violation of the following-described statutes for the State of Tennessee, which are incorporated by reference herein and will be read in their entirety at the trial of this cause to wit:
>
> > T.C.A. § 8-44-103 - Notice of Public Meetings
>
> 7. . . . [T]he planning of raises . . . [and] . . . the filling of positions of City Clerk and City Treasurer were of such pervasive importance that adequate notice should have been given to the public, the Mayor, and the City Administrator . . . [;]adequate notice with regard to the matters to be discussed by the City Council . . . on June 28, 2007, should have also been given to the public pursuant to T.C.A. Section 8-44-103. That the issues concerning the granting of raises and the filling of the position of City Clerk and City Treasurer were of such pervasive importance for citizens and residents of the City . . . , that the public was otherwise entitled to know of this meeting and the discussions which were held.

-3-

8. . . . [T]he actions taken by the City Council . . . at the meeting on June 28, 2007, were arbitrary, capricious, unreasonable, and intentional, and such actions were otherwise irresponsible because the raises and filling of positions of the City . . . employees had been previously prearranged as a last minute plan to substantially increase the pay for a handful of City . . . employees.

9. . . . [W]hile other aspects of the budget for the City . . . were discussed at length and deliberated thoroughly at the meeting held on June 28, 2007, the plan to spend $42,000.00 in salary increases and the creation of a new part-time position was thrown in as a last minute plan to substantially increase the pay for a select handful of City employees at the expense of the taxpayers of the City . . . .

10. . . . [T]he plan to grant salaries to a handful of employees, as well as a plan to amend the budget, was of such pervasive importance that adequate notice should have been given to the public, the Mayor, and the City Administrator . . . , and that adequate notice of the meeting to be held and the agenda to be discussed on June 28, 2007, should have also been given to the public pursuant to T.C.A. Section 8-44-103. . . . [N]o notice was given to the public in advance of the motion to amend the budget and otherwise grant an increase in salary to this handful of employees.

* * *

Among Mr. Fannon's demands, he stated, inter alia, the following:

2. That the meeting held by the Defendants prior to June 28, 2007, and the action taken by the Defendants on June 28, 2007, to otherwise amend the budget for the City . . . and to grant pay raises to the employees as otherwise described in those budget amendments be declared illegal, null, and void.

* * *

5. **That a Temporary Restraining Order be issued against the Defendants, restraining them from granting pay increases to a handful of selected employees and otherwise extending salary increases in the budget amendments that were otherwise adopted by the Defendants at the meeting of the City Council held on June 28, 2007.**

6. That a hearing otherwise be scheduled on the Court docket to nullify and void the budget amendments and action taken by the Defendants at the June 28, 2007 meeting.

* * *

8. That the Plaintiff be awarded costs and reasonable attorney fees.

9. That the Plaintiff be awarded compensatory damages and such other, further, and general relief including reasonable costs and attorney fees under the doctrine of implied indemnity in the State of Tennessee.

\* \* \*

(Emphasis added). After a hearing was held on Mr. Fannon's motion for a temporary restraining order, the trial court stated as follows:

Obviously, the city, through the charter system here under Article VI, has the right to make appointments to the -- these positions, chief of police, public works, street and sanitation, operations manager, code enforcement officer, etcetera.

It doesn't say that they have the right to supervise. It doesn't say they have the right to do certain things. It just says they have the right [to] appoint these people.

If you look back at Article V, I think it's Article V of the charter, and what the city charter does is they basically incorporate . . . the Tennessee Code Annotated language that says what the duties and responsibilities of the city administrator is. Shall have the duty [t]o administer, supervise and coordinate all administrative activities of the affairs of the city.

All, you see the word "all," that means all. It could have said all except for that that's been precluded or [excepted] out by the charter, etcetera, I don't know. But it says "all" because it included all the administrative functions.

Sub 4 of that section, paragraph 4 says to recommend to the city council employment, dismissal, promotion, demotion of any employee, which would include city clerk, city attorney, etcetera.

Six, to review, approve, recommend to the city council a budget for each department of the city coming under the supervision of the city council. To review, approve, recommend to the city council a budget for each department.

And then it down here in the bottom section it says 1-406, which part of the code that was given to me, it is included in the section which I think is the next paragraph down, this section 5.

Section 5 of the charter on page C-13, the city council and its members shall deal with the administrative services of the city only through, only through the city administrator except for the purposes of inquir[y]. Neither the city council or any member thereof shall give orders or instructions to any subordinates of the city administrator.

-5-

There is a purpose for that, to maintain discipline and structure and function of the city so that you don't have a bunch of people running around telling -- and you get city employees scared to death because the councilman said I want you to do this, and then another one says, no, you better not do that, I'm gonna fire you, I'll show you.

And so that is sort of the way it's set up. And so council for the city says, well, Judge, we have overall authority. We pass the -- we have the purse strings -- is basically the argument, I think, from the city's position, we have the purse strings and because we have the purse strings we have the right to do anything we want to.

Now, I disagree with that assertion. I don't think that assertion is correct. I think that they have -- obviously they have the purse strings for the overall function of the budget. They don't necessar[ily] -- it's not -- I don't think you jump from saying that we have the purse strings jumping to saying we're -- we decide salaries and in individual cases we decide who is hired here, fired. And we don't go through, we don't have to run and tell the city administrator everything that we do.

That appears to me to be in conflict with Article V by saying that. So that being said, where [are] we at? Because the administrator says I wasn't told of any of this information. This was just run through the night of the meeting of June the 28th. It was never submitted to me for considerations for budget purposes.

Because I think the administrator would have to crunch numbers and say that isn't in the budget, that's not going to balance. That budget will not balance if you add this, and that there, and all this other stuff.

\* \* \*

. . . Article V is what the city administrator's responsibilities are. Okay? We can sit here and talk until we are blue in the face. It is my impression, unless you all can show me something else in the charter -- the charter says that the city council can hire and appoint these people.

Then it goes in Article VI, then he goes back to Article V and says what the administrator does, what his or her responsibilities are.

And then in the end it says, well, they have the legislative, they have the purse strings.

Does that necessarily give them the right to walk in the night of June 28th and decide we're going to give this person five thousand, that person three thousand, that one a thousand, that one five thousand and just pass it without the administrator being aware of the budget because it says he is supposed to review the budget? He is supposed to administer. He is supposed to recommend.

**Nothing is ever said to the administrator prior to that meeting. That has to be in conflict with Article V of the charter. If it's not, I don't know why it's not.**

* * *

. . . Let's do this. The charter is in conflict. We can sit here until we're blue in the face.

**I'm going to grant your injunction.**

* * *

. . . I think that, again, I think that there is two issues here. There is an issue about the charter, whether or not the charter in some way or another was not complied with, if there is a conflict with the charter in reference to whether or not this information should have been sent through or been presented to the city administrator prior [to] its consideration on June 28th.

And then the open meetings violation. **Well, the open meetings violation, we have not even got to that issue yet. . . .**

**. . . [I]f we can resolve the conflict issue with the charter, I don't even get into the issue of the Open Meetings Act. . . . I may be wrong by doing this, at least the impression I get is that the information be provided to the city [administrator], that it goes back up before the commission, the full commission. They apparently got the votes to take care of this and that it complies with the conflict -- that resolves the conflict with the charter, completely resolves the issue about the Open Meetings Act because we don't even get into that issue because it becomes a moot issue once it goes back down and comes back up.**

* * *

And no councilman has to testify under oath as to what they did, be put in a compromising position or not . . . .

But I think that obviously the law is quite clear that the law doesn't prevent councilmen from having discussions about budgetary things. They have got to go answer questions and do things. I mean they have got to go and investigate before they do things. And the law doesn't prohibit that from going on. But I think the open meetings violation just simply prevents those informal meetings taking place to decide what we're going to do at the next public meeting. And that -- we haven't even gone down that road.

-7-

**We are just trying to resolve what appears to [be] a conflict in the charter. If there is a conflict in the charter, just submit the numbers, re-submit the numbers to the city administrator. He says there is money there to take care of it, and it is just re-submitted and they vote on it.**

\* \* \*

**. . . [I]f it goes back down and it's corrected, that the administrator is informed of the budgetary numbers and as to what has been proposed and it goes back up and it's voted on, it makes the open meetings violation before, it seems to me, to be moot. It's done, it's done.**

\* \* \*

. . . I think the order needs to show that the Court found a conflict existing within the city charter itself in reference to Article V and Article VI and with the overall legislative function of the city council.

Furthermore, the Court found that it is the opinion of the Court, because of the conflict that this budgetary information, these pay raises, should have been submitted within a reasonable period of time to the city administrator for his consideration prior to the meeting of June 28th. It -- and this doesn't necessarily have to be there, and therefore, the city is enjoined from instituting these pay raises until, I guess, another workshop, that these numbers are formally presented to the city administrator again for consideration[].

And then the numbers are basically run back up the flagpole –

(Emphasis added). The next day, the trial court granted Mr. Fannon's motion for a temporary restraining order. The trial court provided that

the Plaintiff has otherwise demonstrated that irreparable harm or injury will occur to the Plaintiff, as well as the taxpayers of the City of LaFollette, and it further appearing to the Court that the Plaintiff has the probability of succeeding on the merits in the above cause of action, it is

**ORDERED** that the Defendants are hereby enjoined from making budget amendments to the budget for the City of LaFollette granting raises specifically to Jim Mullens, Public Works, Johnny Burge, Recreation Director, Stan Foust, Animal Control, Nancy Greene, Librarian, Terry Sweat, Financial, Wanda Dower, Treasurer, Amanda Massengill, Front Office, Lynda White, City Clerk, and David Young, Administrator, until the same has been done in compliance with the City Charter for the City of LaFollette, and that the granting of pay raises to these employees, as specifically set out in the minutes for the meeting of the City Council for the City of

-8-

LaFollette dated June 28, 2007, shall be enjoined and the Defendants are otherwise restricted from taking any further action to grant these pay raises until there has been compliance with the City Charter for the City of LaFollette and a review by the City Administrator and the City Council for the City of LaFollette.

All other matters are reserved pending a final hearing and trial of this cause of action.

The court costs of this action to date shall be taxed to the Defendants.

At the next regularly scheduled meeting of the City Council on August 7, 2007, in compliance with the Charter and after review by the City Administrator, the pay raises at issue were enacted once again by a 3-1 vote. Six days later, Mr. Fannon filed a motion for partial summary judgment for the alleged violation of the Open Meetings Act addressed in the complaint. The following month, the Defendants moved the trial court to dismiss the matter on the grounds of mootness.

On December 11, 2007, the trial court denied Mr. Fannon's motion for partial summary judgment and granted the Defendants' motion to dismiss the action as moot. The trial court concluded that the City Council cured any flaws and the raises were legislated properly and effectively by the action taken at the August 7, 2007 meeting.[1] The request for attorney's fees was reserved for future proceedings.

In February 2008, Mr. Fannon sought attorney's fees and discretionary costs as reimbursement for (a) having to mount the lawsuit because of the Defendants' alleged wrongdoing; and (b) achieving the goal of ensuring that those raises were implemented in a manner that was faithful to law. In a hearing on June 2, 2008, the trial court stated as follows:

[T]he Open Meetings Act was not litigated, primarily because it was obvious to me in the first hearing that part of the charter had not been complied with where the administrator was not made aware of the pay raises that were granted and which appeared in the charter to require that to have been done.

The Court, I believe, immediately directed that that be complied with, that the city councilmen go back and have another meeting, apparently, if there was a defect. And the Court didn't find a defect in reference to the Open Meetings Act; simply found an open and obvious defect in reference to the charter itself. However, the subsequent meeting of the city councilmen resolved the Open Meetings violation, which basically made that issue moot. And this matter was resolved.

---

[1] In *Neese v. Paris Special School Dist.*, 813 S.W.2d 432 (Tenn. Ct. App. 1990), this court explained the "cure doctrine." When a public body re-enacts or redoes a previous action after a full and public discussion of the matters discussed in meetings held allegedly in violation of the Open Meetings Act, the new action or ordinance will not be nullified even if it originally was adopted or taken without compliance with the Act. *Id*. at 436.

* * *

[H]ere we have Mr. Fannon who brings a suit concerning certain violations of the charter and the Open Meetings Statute. And it appears to me he prevailed on the issue in reference to the charter, and the Open Meetings Act became moot after the city had a subsequent meeting in reference to the issue about pay raises.

* * *

**The Court specifically finds that Mr. Fannon acted in his official capacity. The Court relies upon the *Dobson* decision of 1980, the decision of Judge Goddard. It appears that Judge Goddard's reasoning appears to be rational and reasonable concerning the facts and circumstances. And this case appears to be on point with that. . . . But for the *Dobson* opinion, the Court would have to deny attorney's fees in this case. The Court relies upon that ruling.**

* * *

The Court believes a fee of $250 an hour is appropriate in this case. Multiply that by 30 hours, and that comes to $7,500. . . .

* * *

**[T]he Court relies upon Mr. Fannon bringing suit in his official capacity, also that he was the prevailing . . . party in this matter.** The Court further finds that this case appears to be on point with Judge Goddard's ruling and adopts the case of 1980. Until that matter is overruled, the Court is bound to follow that ruling.

(Emphasis added). In a second hearing, the trial court awarded Mr. Fannon the sum of $638.05 in discretionary costs, finding that "the Plaintiff is entitled to recover discretionary costs on the basis that when a public official sues or has been sued in his official capacity, he is entitled to be represented at the public expense." The Defendants timely appealed.

## II. ISSUES

The Defendants raise the following issues, which are restated as follows:

A. Whether Mr. Fannon had standing to pursue his claims against the City.

B. Whether Mr. Fannon is the prevailing party.

C. Whether the trial court erred in awarding attorney's fees and discretionary costs to Mr. Fannon.

-10-

## III. STANDARD OF REVIEW

Our review is de novo upon the record of the proceedings below; however, that record comes to us with a presumption that the trial court's factual findings are correct. Tenn. R. App. P. 13(d). We must honor that presumption unless we find that the evidence preponderates against the trial court's factual findings. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 27, 91 (Tenn. 1993). The scope of review of the trial court's conclusions of law is de novo with no presumption of correctness accompanying the trial court's decision. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996).

The standard of review for an award of attorney fees and discretionary costs is deferential, because "awards of attorney's fees are largely discretionary with the trial court." *Keyt v. Keyt*, 244 S.W.3d 321, 333 (Tenn. 2007). On appeal, the party who takes issue with the trial court's decision regarding discretionary costs assumes the burden of demonstrating that the trial court abused its discretion. *Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178, 215 (Tenn. Ct. App. 2008). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

The issue of whether one is a "prevailing party" in the litigation is a matter reserved to the trial court's exercise of discretion. *C.S.C. v. Knox County Bd. of Educ.*, No. E2006-01155-COA-R3-CV, 2007 WL 1519543(Tenn. Ct. App. E.S., May 25, 2007).

## IV. DISCUSSION

### Declaratory Judgment

Mr. Fannon sought review under the Declaratory Judgment Act, Tenn. Code Ann. § 29-14-103 (2000):

> Any person . . . whose rights, status, or other legal relations are affected by a . . . municipal ordinance . . . may have determined any question of construction or validity arising under the . . . ordinance . . . and obtain a declaration of rights, status or other legal relations thereunder.

Declaratory judgment actions enable parties whose rights are at stake to invoke the aid of the courts to remove uncertainty from the legal relations and to clarify these rights before irretrievable, or at least prejudicial, acts are taken. *Delaney v. Carter Oil Co.*, 174 F.2d 314, 317 (10th Cir. 1949). Declaratory judgment statutes are remedial in nature and should be construed broadly in order to accomplish their purpose. Tenn. Code Ann. § 29-14-113 (2000); *Shelby County Bd. of Comm'rs v. Shelby County Quarterly Court*, 392 S.W.2d 935, 941 (Tenn. 1965).

A plaintiff in a declaratory judgment action need not show a present injury, but an actual "case" or "controversy" is still required. *Cardinal Chem. Co. v. Morton Int'l*, 508 U.S. 83, 95 (1993). A bona fide disagreement must exist; that is, some real interest must be in dispute. *Goetz v. Smith*, 278 S.W. 417, 418 (Tenn. 1925). The justiciability doctrine of standing is a viable defense. *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 838 (Tenn. 2008).

## Open Meetings Act

The Tennessee Open Meetings Act provides that "adequate public notice" must be given of meetings by any governmental body. Tenn. Code Ann. § 8-44-103. The Act is remedial in nature and permits courts "to issue injunctions, impose penalties, and otherwise enforce the purposes of" the Act. Tenn. Code Ann. § 8-44-106(a). The enforcement tools of Tenn. Code Ann. § 8-44-106 are available and/or required only if a violation of the Act is found to have occurred.

## A. Standing

Mr. Fannon filed suit "individually and as a City Councilman for the City of LaFollette," and he is "a citizen and resident of Campbell County, Tennessee" and "a taxpayer of the City of LaFollette." Mr. Fannon asserted that he, "along with the other taxpayers of LaFollette, Tennessee will be irreparably harmed and they will suffer from the willful and unlawful conduct of the Defendants." He also claimed that he qualifies as "any citizen" under Tenn. Code Ann. § 8-44-106 to enforce the Open Meetings Act. Mr. Fannon noted, in particular, that he has standing to assert an Open Meetings Act claim challenging a closed meeting to deliberate the budget for the City, as well as expending revenue for salary increases. *See* Tenn. Code Ann. § 8-44-106(a).

In his affidavit of February 2008, in relation to his fee claim, Mr. Fannon swore the following:

> 10. That upon the discovery of the irregularities in the meeting held to initially grant pay raises to the above-described individuals, I called upon the City Attorney, Reid Troutman, to assist me in filing a cause of action against the Defendants.

> 11. That due to a conflict of interest, the City Attorney, Reid Troutman, could not represent me in this matter.

> 12. That I had to secure the services of David H. Dunaway **in order to perform my duties as an elected City Councilman and to otherwise fulfill my fiduciary responsibilities to the City of LaFollette.**

(Emphasis added). In Mr. Fannon's counsel's affidavit, the following was provided:

As part of my representation of Mr. Fannon, it was agreed that I would seek attorney fees on Mr. Fannon's behalf **as a result of his having to file this cause of action in his official capacity as a City Councilman for the City of LaFollette.**

(Emphasis added).

A citizen's standing to sue a governmental entity is typically a threshold issue that should be resolved before addressing the merits of the case. *See Phillips v. County of Anderson*, No. E2000-01204-COA-R3-CV, 2001 WL 456065 (Tenn. Ct. App. E.S., April 30, 2001). In *Cobb v. Shelby County Bd. of Comm'rs*, 771 S.W.2d 124 (Tenn. 1989), the Tennessee Supreme Court stated:

Because citizens' suits do burden the conduct of public affairs, a defendant entity or officer should not be obliged to defend on the merits if he is entitled to a dismissal for lack of standing. Nor should the court critique the conduct of public officials if the cause is not justiciable.

*Id.* at 125. As a policy justification for this rule, the Court explained:

On the one hand, it is undeniably the right of a taxpayer to know that his taxes are expended properly and are not unlawfully diverted or misused. On the other hand, the courts have long recognized the necessity of allowing municipal officials to perform their duties without interference from frequent and possibly frivolous litigation and the inexpedience of putting municipal officers at hazard to defend their acts whenever any member of the community sees fit to make the assault, whether for honorable motives or not. The courts have been commensurately reluctant to usurp or supersede the discretion of municipal authorities to determine which municipal undertakings are necessary and appropriate.

*Badgett v. Rogers*, 436 S.W.2d 292, 293-94 (Tenn. 1968); *see also Parks v. Alexander*, 608 S.W.2d 881, 885 (Tenn. Ct. App. 1980) ("The generally acknowledged purpose of this requirement of special damage or private harm to the individual rests in the public policy of protecting public corporations from a profusion of suits.").

In the instant case, the trial court never addressed whether Mr. Fannon has standing. A standing inquiry requires a court to decide whether a party has a sufficient personal state in the outcome of the controversy to warrant the exercise of the court's power on its behalf. *Browning Ferris Ind. v. City of Oak Ridge*, 644 S.W.2d 400, 402 (Tenn. Ct. App. 1982). "The rule in Tennessee is well established that citizens and taxpayers are without standing to maintain a lawsuit to restrain or direct governmental action unless they first allege and establish that they will suffer some special injury not common to citizens and taxpayers generally." *LaFollette Med. Ctr. v. City of LaFollette*, 115 S.W.3d 500, 503 (Tenn. Ct. App. 2003) (citing *Patton v. City of Chattanooga*, 65 S.W.414, 420-21 (Tenn. 1901)); *see also Badgett*, 436 S.W.2d at 294.

To establish standing, a party must demonstrate:

(1) That the party has sustained a distinct and palpable injury;

(2) That the injury was caused by the challenged conduct; and

(3) That the injury is capable of being addressed by a remedy the court is prepared to give.

*Metropolitan Air Research Testing Auth., Inc. v. Metropolitan Gov't of Nashville and Davidson County*, 842 S.W.2d 611, 615 (Tenn. Ct. App. 1992). The primary focus of a standing inquiry is on the party, not the merits of the claim. *Id.*, 842 S.W.2d at 615. The party's standing does not depend on the likelihood of success of his or her claim on the merits. *Id.* However, whether a party has standing "often turns on the nature and source of the claim asserted." *Id.* Thus, a "careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted" is required. *Id.*

*City Councilman*

The Charter does not specifically grant Mr. Fannon the power to sue on behalf of the City Council, nor does it grant him the power to sue on behalf of the City. The Charter grants the City the power to "sue and be sued." The City Council, composed of a Mayor and four Councilmen, are vested with "all legislative powers outlined in this Charter and the statutes of this state" can institute a lawsuit. The Charter makes clear that a City Councilman only has the authority to act through the legislative body, the City Council, by majority vote. Defendants contend a single member of the City Council therefore does not have the authority to sue within his official capacity .

The Defendants rely on *Abel v. Welch*, 315 S.W.2d 268 (Tenn. 1958), to support their contention. In *Abel* members of the Rhea County Purchasing and Financing Commission filed suit in their official capacity against the Rhea County Supervisor of Roads in his official capacity. The Tennessee Supreme Court held that the members of the Purchasing and Financing Commission had no legal existence separate and apart from the governmental authority of Rhea County, that the Commission had no implied authority to maintain an action against the Supervisor of Roads, and that the Commission had no power to employ an attorney to bring the action. *Abel,* 315 S.W.2d at 270.

The *Abel* Court looked to the Private Act that created the Commission and the title Supervisor of Roads. The Court noted that both the plaintiff and the defendant were "creatures . . . of Rhea County," and both "hold their respective offices pursuant to the provisions of Chapter 313 of the Private Acts of 1955 and exercise their authority accordingly." 315 S.W.2d at 268. The court found that the way the Act was structured, it was the plaintiff and the defendant together that composed the Rhea County Supervisory Committee. *Id.* Thus, in essence, the lawsuit was filed by opposing members of the same governmental body.

The Defendants assert that as in *Abel*, a single member of the City Council has no authority to file a lawsuit on behalf of the City Council. By purporting to sue in his "official capacity," the Defendants claim Mr. Fannon filed a lawsuit on behalf of the City Council. They argue that a member of the City Council cannot take such action without following the steps outlined in the

Charter. They further assert that a single member of the City Council is not authorized under the Charter to maintain a lawsuit on behalf of the City Council. Thus, like the plaintiff in *Abel*, the Defendants contend that Mr. Fannon has no implied authority to maintain the lawsuit and cannot sue in his "official capacity."

This court has held that status as a city councilman is not a sufficient personal stake in the outcome of a controversy to demonstrate standing. *See Malone v. City of Knoxville*, E2002-00734-COA-R3-CV, 2003 WL 21018633 (Tenn. Ct. App. E.S., May 5, 2003) (citing *MARTA v. Metro. Gov't*, 842 S.W.2d 611 (Tenn. Ct. App. 1992)). In *Malone*, the council members asserted two grounds in support of their claims of possessing proper standing. First, they claimed the requirements of their oaths of office provided standing to sue. Second, they contended standing existed "because of their unique status as Knoxville City Council Members." The appellants relied on the precedent of *Peeler v. Luther*, 135 S.W.2d 926 (Tenn. 1940). Discussing the significance of *Peeler*, the *Malone* court observed as follows:

> In *Peeler* the plaintiff was a county official acting as Chairman of the County Highway Commission. The Tennessee Supreme Court found that he had standing to sue for recovery of funds that had been illegally diverted by his predecessor. The Court noted that the plaintiff in *Peeler* was "more than a private citizen and taxpayer" and the Appellants argue this language "seemingly elevates the status of the county official in *Peeler*, giving him the necessary standing to bring suit in his official capacity." However, reading this language in the context of the case as a whole we are compelled to conclude that it was not merely the plaintiff's position as a county official that authorized him to prosecute the lawsuit for recovery of the funds, but rather his singular position as highway commissioner. By virtue of his employment as highway commissioner the plaintiff in *Peeler* was specifically vested with supervision of those funds he was seeking to recover and he was specifically given the power to employ attorneys in that regard by the act which created the board of highway commissioners. . . .

*Malone*, 2003 WL 21018633, at *3. The *Malone* court went on to hold that "[t]he duties to uphold state law and the state and federal constitutions which the Appellants assert arise from their oaths of office and the Appellants' status as members of the city council and beer board are, in our opinion, too general to give them standing . . . ." *Id.* The court specifically noted that "[w]hile the court in the *Peeler* case emphasized that the Plaintiff was a county official in addition to being a private citizen, the court did not give any reason to believe that such 'public official' status constituted an exception in itself to the general rule prohibiting a public wrong suit absent a special interest or injury." *Id.* (quoting trial court observation regarding *Peeler*).

Mr. Fannon argues that the facts and circumstances in *Malone* are different than the facts of the instant case. He contends that it is not the substantive terms of the legislative enactment that was the object of the litigation but rather the process that led to the matter being before the City Council for a vote. Thus, according to Mr. Fannon, the difference between this case and *Malone* is the difference between process and result. He contends that as a City Council member, he has a particular interest in the process by which measures come before him for a vote. He argues that he

has standing to object legally to a flawed process, and this special interest in the process sets him apart from the general public. Mr. Fannon admits that if a city council member has no objection to the process but only to the result, then the member has no more special interest than the general public. Mr. Fannon cites no case law in support of his theory, and our research has revealed none.

An action questioning a municipality's conduct or its officers is ordinarily dependent upon averment of a special injury or interest. *Badgett*, 436 S.W.2d at 294. In view of our previous decision in *Malone*, we find that the wrong alleged by Mr. Fannon in his complaint -- a violation of the Open Meetings Act -- is no more individually grievous to him than any other citizen and taxpayer. Furthermore, Mr. Fannon's position as a City Councilman is not enough to confer special status to maintain this action.

*Taxpayer Exception*

In *Badgett*, the Tennessee Supreme Court noted "where it is asserted that the assessment or levy of a tax is illegal or that public funds are misused or unlawfully diverted from stated purposes" is an exception to the general rule regarding standing. *Badgett*, 436 S.W.2d at 294; *LaFollette Med. Ctr.*, 115 S.W.3d at 504. This power is not based on any statute expressly authorizing such action.

In order for a taxpayer to have standing to challenge the legality of a public funds expenditure the following elements must exist: (1) the plaintiff/taxpayer has taxpayer status; (2) the taxpayer alleges a specific illegality in the expenditure of public funds; and (3) the taxpayer has made a prior demand on the governmental entity asking it to correct the alleged illegality. *Cobb v. Shelby County Bd. of Comm'rs*, 771 S.W.2d 124, 126 (Tenn. 1989); *Ragsdale v. City of Memphis*, 70 S.W.3d 56, 62-3 (Tenn. Ct. App. 2001). To satisfy the prerequisite of prior demand, a plaintiff must "have notified appropriate officials of the illegality and given them an opportunity to take corrective action short of litigation." *Id.*

In the case at bar, Mr. Fannon has arguably alleged a misuse or diversion of public funds. The Defendants assert, however, that Mr. Fannon has not alleged that he made a prior demand on the City, and he has failed to show or allege that a demand upon City officials would have been futile.

The *Badgett* Court noted that "such a demand is excused where the status and relation of the involved officials to the transaction in question is such that any demand would be a formality." *Badgett*, 436 S.W.2d at 295 (citations omitted). In this case, we find that a prior demand would have been a formality and should be excused. Thus, under the rationale of *Badgett* and similar cases, we find that the record supports a finding that Mr. Fannon has standing as a taxpayer.

B. Prevailing Party

Mr. Fannon contends that he is entitled to attorney's fees. "He contends that the trial court correctly awarded attorney's fees because Plaintiff successfully demonstrated his right to obtain a

temporary injunction which was granted by this Court pursuant to an Order entered July 19, 2007 . . . and because the Plaintiff was successful in this cause of action as an elected official." Mr. Fannon argues that the temporary restraining order achieves the goal of his lawsuit.

The Defendants claim that the trial court erred in finding that Mr. Fannon was a prevailing party because any success on the merits of his claims was non-existent or very limited, especially after the trial court denied Mr. Fannon's partial motion for summary judgment on the Open Meetings Act and granted the Defendants' motion to dismiss. They note that of the eleven demands Mr. Fannon made in his complaint, he arguably only "prevailed" on one demand, because the trial court did grant a temporary restraining order. The Defendants stress, nonetheless, that the trial court made no findings of liability.

In the present case, there is no question that Mr. Fannon "prevailed" on his application for a temporary injunction. However, according to 20 Am.Jur. 2d *Costs* § 16 (2005):

> [T]he general rule is that no allowance is provided for in favor of a party who may prevail on an intermediate motion or proceeding. Thus, **the fact that plaintiffs are granted a temporary restraining order does not necessarily give them prevailing party status, since the restraining order is not a determination on the merits but merely an attempt to preserve the status quo pending a determination on the merits of their cause.**

(Emphasis added). A grant of a temporary restraining order that preserves the situation of the parties in status quo until a final determination of the controversy is merely indicative of a "procedural" success and will not qualify a plaintiff for attorney's fees. *Sutton v. Evans*, 845 F.Supp. 1192, 1197 (M.D. Tenn. 1994), *see Hastings v. Kelley*, 181 P.3d 750, 753 (Ok. Civ. App. 2008). In the instant case, the trial court did not hold that the Defendants violated the Open Meetings Act. Rather, the trial court found that a conflict existed between Article Five and Article Six of the Charter. The trial court subsequently denied Mr. Fannon's motion for partial summary judgment on the alleged violation of the Tennessee Open Meetings Act and granted the Defendants' motion to dismiss because of mootness. We believe Mr. Fannon's "success" was just a procedural victory -- the reasoning for the granting of injunctive relief was to maintain the status quo in order to permit the Defendants time to "redo" the legislation at issue and make any issue regarding an alleged Open Meetings Act violation moot. The trial court's ruling involved neither affirmative relief to Mr. Fannon or a final determination on the merits in favor of Mr. Fannon. Procuring a temporary restraining order in which the court does not address the merits of the case is not sufficient to give a plaintiff prevailing party status. *See, e.g., J.O. v. Orange Twnshp. Bd. of Educ.*, 287 F.3d 267, 272-74 (3d Cir. 2002); *Foreman v. Dallas County*, 193 F.3d 314, 323 (5th Cir. 1999); *Christopher P. v. Norma P.*, 915 F.2d 724, 805 (2d Cir. 1990). In our view, Mr. Fannon's relief represented the mere "procedural" success that does not result in Mr. Fannon becoming a "prevailing party."

C. Attorney Fees/Discretionary Costs

The trial court's award of attorney's fees and costs in reliance upon *Dobson v. Carter* (Tenn. Ct. App. Dec. 19, 1980) was clearly based on Mr. Fannon's role as a City Councilman. In *Dobson*, members of the Hamilton County School Board challenged the award of attorney fees to the Superintendent. This court held as follows:

> In the present case [attorney's fees] are a judgment rendered upon a counter-claim premised, not on the fact that the Superintendent prevailed, but rather that when suing or being sued in his official capacity, he has a right to be represented at public expense. . . .
>
> . . . Because we think it unlikely a superintendent would finance litigation of this type from his own resources, a holding to the contrary would have a chilling effect upon the disposition of a superintendent to require a school board to follow the mandates of the Legislature, and would -- if not encourage -- at least permit the board to violate state statutes with impunity.

Slip op. at 3-4. The trial court in this case found the decision to be the sole grounds supporting an award to Mr. Fannon of attorney's fees and costs. Thus, the trial court ruled as follows:

> The Court specifically finds that Mr. Fannon acted in his official capacity. The Court relies upon the *Dobson* decision of 1980, the decision of Judge Goddard. It appears that Judge Goddard's reasoning appears to be rational and reasonable concerning the facts and circumstances.

Mr. Fannon alleges that he is entitled to reimbursement of his attorney's fees because he "was a city council member who was suing the very body in which he served. Under those circumstances, he could hardly expect the City Attorney to represent him." Because Mr. Fannon brought this suit in his official capacity, he contends that he should be represented at public expense. Mr. Fannon asserts as follows:

> Because it is unlikely that a City Councilman would finance litigation of this type from his or her own resources, this court should grant the Plaintiff, Bob Fannon, attorney fees and discretionary costs because a holding to the contrary would have a chilling effect upon the disposition of a City Councilman to otherwise require the City of LaFollette or its Board Members to follow the mandates of the legislature and/or its Charter and would, if not encourage, at least permit the City Council and/or the City of LaFollette to violate state statutes and the Charter of the City of LaFollette with [ ] impunity.

Tennessee adheres to the well-established "American rule," which provides that "litigants pay their own attorney's fees absent a statute or an agreement providing otherwise." *State v. Brown & Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn. 2000); *see also Taylor v. Fezell*, 158 S.W.3d 352, 359 (Tenn. 2005). Under the American rule, a party in a civil action may recover attorney's fees only if (1) a contractual or statutory provision creates a right to recover attorney's

fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case. *Taylor*, 158 S.W.3d at 359; *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998). As a general principle, the American rule reflects the idea that public policy is best served by litigants bearing their own legal fees regardless of the outcome of the case. *House v. Estate of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008).

In *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 313 (Tenn. 2009), the current Tennessee Supreme Court noted that "[m]ost Tennessee cases . . . have specifically denied the award of attorney fees where no provision for attorney fees was specifically or expressly included in the statutory language." The *Cracker Barrel* Court held **"statutory construction has been consistent with contract construction in requiring a clear intent to allow attorney fees to a prevailing party before such fees may be awarded."** *Id.* (emphasis added). The statutory language before us in this case does not include a reference to the provision for attorney's fees. Neither the Tennessee Open Meetings Act, Tenn. Code Ann. § 8-44-101, et seq., nor the Declaratory Judgment Act, Tenn. Code Ann. § 29-14-101, et seq., provide for the award of attorney's fees to a successful litigant proceeding under either Act. Thus, even if Mr. Fannon was a prevailing party, the trial court abused its discretion in awarding attorney's fees to Mr. Fannon on that basis.

We likewise find Mr. Fannon's reliance upon the unreported opinion in *Dobson* unavailing. As was noted in *Malone*, we find a distinction between the singular position of the Superintendent in *Dobson* charged with leading a school board and Mr. Fannon's membership on a four-person city council. *See Malone,* 2003 WL 21018633, at *3. Mr. Fannon's claim to "official capacity" based on his "special interest" in ensuring that the law is followed does not "derive from such specificity of authority" as was possessed by the Superintendent in *Dobson. See id.,* at *3.[2] Thus, we find *Dobson* inapplicable to this case.

As to the issue of discretionary costs, the trial court ruled as follows:

> The Court finds that the Plaintiff is entitled to recover these discretionary costs on the basis that when a public official sues or has been sued in his official capacity, he is entitled to be represented at public expense.

> The court costs of this cause shall be taxed to the Defendants.

The trial court again based its ruling on *Dobson*.

Pursuant to Rule 54.04 of the Tennessee Rules of Civil Procedure, the following discretionary costs are allowable:

---

[2] Reported case law in this state reveals that proceeding in "official capacity" does not result in the payment of attorney's fees. *See State ex rel Shelby County Election Comm'n v. Shelby County Bd. of Comm'rs*, 656 S.W.2d 9, 10 (Tenn. Ct. App. 1983).

reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs.

Tenn. R. Civ. P. 54.04(2). The legal standards applicable to a decision on discretionary costs have been set out as follows:

When deciding whether to award discretionary costs under Tenn. R. Civ. P. 54.04(2), the courts should (1) determine whether the party requesting the costs is the "prevailing party," (2) limit awards to the costs specifically identified in the rule, (3) determine whether the requested costs are necessary and reasonable, and (4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled.

*Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35-36 (Tenn. Ct. App. 2002); *see also Trundle v. Park*, 210 S.W.3d 575, 582 (Tenn. Ct. App. 2006).

The Rule was designed as an attempt to make the prevailing party whole. *Massachusetts Mut. Life Ins. Co.*, 104 S.W.3d at 33. Because Mr. Fannon was not the prevailing party, he is not entitled to an award of discretionary costs. Even if Mr. Fannon was the prevailing party, expenses expended in preparing for a pretrial hearing on a motion for a temporary restraining order would not qualify under the Rule.

## V. CONCLUSION

For the aforementioned reasons, the judgment of the trial court is reversed and this case is remanded to the trial court for further proceedings as may be necessary. Costs of the appeal are assessed to Appellee, Bob Fannon.

_____
JOHN W. McCLARTY, JUDGE

-20-